# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Robert Curry | : | |
| 725 Rhoads Avenue | : | |
| Jenkintown, PA 19046 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| United Parcel Service, Inc. | : | NO.: 17-2331 |
| d/b/a UPS | : | |
| 55 Glenlake Parkway | : | |
| Atlanta, GA 30328 | : | |
| | : | |
| And | : | |
| | : | |
| Teamsters Local 623 | : | |
| 4369 Richmond Street | : | |
| Philadelphia, Pa 19137 | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED
## CIVIL ACTION COMPLAINT

**I.    PARTIES**

1.    Plaintiff, Robert Curry, is an adult individual residing at the above-captioned address. Curry is a citizen of Pennsylvania.

2.    Defendant, United Parcel Service, Inc., doing business as UPS ("UPS"), is a corporation duly organized and existing under and by virtue the laws of the State of Ohio, with an office at the above-captioned address. At all material times, UPS performed substantial business in the County of Philadelphia. UPS is a citizen of the State of Ohio.

3.    Defendant, Teamsters Local 623, is an organization duly organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania, with an office at the above-

captioned address. At all material times, Teamsters Local 623 performed substantial business in the County of Philadelphia. Teamsters Local 623 is a citizen of Pennsylvania.

## II. JURISDICTION AND VENUE

4. Respectfully, this Honorable Court does not have jurisdiction over this matter as (a) diversity of citizenship does not exist; and (b) this dispute does not raise a question of federal law.

5. Venue however is appropriate within this District as significant events giving rise to this claim occurred here and at least one Defendant maintains a principal place of business and/or does business within this District.

## III. OPERATIVE FACTS

6. On or around July 29, 1996, Plaintiff was hired by Defendant, UPS, and joined the local union, Defendant, Teamsters Local 623. Plaintiff worked part-time until approximately 2002, when Plaintiff became a package driver.

7. Plaintiff worked at UPS without incident and with positive reviews until in or about 2013.

8. In or around Winter 2013, UPS's union contract with the Teamsters was approaching expiration. Under negotiation was a divisive change in health care benefits, from an excellent Blue Cross / Blue Shield health insurance plan to a Teamster-managed TeamCare health insurance plan.

9. Both national and local Teamsters leadership were providing little to no information to their members on the coverage or other details of the proposed Teamster-managed TeamCare health insurance plan.

10. Plaintiff decided to have a t-shirt made, stating "Vote No" in reference to the membership vote on accepting the new contract with UPS, which included the Teamster-managed TeamCare health insurance plan. The t-shirt was designed on UPS-brown t-shirts with the appropriate-matching yellow wording, stating "Vote NO". Plaintiff began wearing his "Vote No" t-shirt.

11. The popularity of the t-shirt climbed rapidly. Plaintiff sold the t-shirt to hundreds of co-workers at Teamsters Local 623. In time, Plaintiff joined a Facebook Page, entitled "Vote No on UPS Contract," through which Plaintiff supplied t-shirts to local Teamster unions all over the country.

12. At about this same time, Plaintiff joined Teamsters for a Democratic Union ("TDU"), a reform union within Teamsters. TDU represents itself as a reform union that provides education and information to Teamster members that the national union leaders will not provide.

13. During 2013, Plaintiff became a nationally-recognized reform leader. He traveled to conventions, met with numerous members, and even had various articles written about him and his efforts to reform the Teamsters.

14. Plaintiff publically backed Fred Zuckerman, President of Teamsters Local 89 in Louisville, Kentucky for General President of Teamsters in his race against Jimmy Hoffa, Jr., a notorious union leader. In fact, Plaintiff circulated a petition online to replace Hoffa that garnered over 800 signatures.

15. During Summer 2013, in preparation of the vote on the new contract with UPS, Plaintiff and other members of Teamsters Local 623 camped outside the UPS buildings in Philadelphia, Pennsylvania while they were not working. Plaintiff personally made "Vote No" signs and banners, which he and the other members displayed outside the UPS buildings in Philadelphia, Pennsylvania.

16. At this time, Teamsters Local 623 leadership told members to vote "Yes" in favor of the new contract with UPS.

17. As a result, an overwhelming 80% of the membership of Teamsters Local 623 voted "No". In fact, eighteen (18) local chapters voted down the new contract across the country, forcing the national Teamsters Union back to the negotiating table.

18. Following the first successful "No" vote on the national UPS contract, Plaintiff formed a slate of seven (7) individuals to run for leadership of the Teamsters Local 623, with Plaintiff at the top of the ticket. Plaintiff advertised the ticket as "The Integrity Slate".

19. The Teamsters Union prepared a new vote on the UPS contract, with minimal differences. In preparation of the vote, Teamsters Local 623 leadership asked Hoffa for help. Hoffa sent several International Vice Presidents to Philadelphia to support the local leadership. During this time, Hoffa also sent individuals, including Defendant, John Doe 1, Greg Yerace, to various local chapters in order to strong-arm the members into voting "Yes."

20. Plaintiff and The Integrity Slate again made "Vote No" signs and banners, which he and the other members displayed outside the UPS buildings in Philadelphia. They also handed out fliers, again urging members to "Vote No" with an explanation of the rationale.

21. In October 2013, an overwhelming 80% of the membership of Teamsters Local 623 again voted "No". In fact, three (3) chapters again voted down the new contract across the country, again forcing the national Teamsters Union back to the negotiating table.

22. Rather than voting a third time, Hoffa and the national Teamsters leadership changed the Constitution of the Teamsters to allow the national leadership to adopt the new contract with UPS without a third vote.

23. The Integrity Slate, with Plaintiff in the lead, handed out t-shirts, fliers, and novelties to their co-workers in advance of the local leadership election. In fact, Plaintiff even sent campaign mailers to every member of the Teamsters Local 623; in excess of 2,500 members.

24. Out of 2,500 members, The Integrity Slate lost by only 30 votes. However, Plaintiff was approached by several individuals claiming knowledge of election fraud.

25. Plaintiff accepted his loss, despite the occurrences of election fraud, and prepared to run again in the 2016 election.

26. Plaintiff experienced verbal harassment from Teamsters Local 623 leadership and the leadership's friends following the election that was ongoing until his retaliatory termination. On a regular basis, Plaintiff's paycheck was incorrect and attempts to fix the paychecks were responded only with additional verbal harassment.

27. In or around Spring 2014, Plaintiff signed up to be trained as a CDL Class A truck driver. However, despite his nineteen (19) years of seniority, Plaintiff was skipped over by the local leadership.

28. Plaintiff filed a grievance for being skipped over based on his seniority. Eventually, as a result, Plaintiff was awarded the training and obtained his CDL Class A truck driver license. Plaintiff began working as a tractor trailer truck driver in or around July 2014.

29. On or about April 17, 2015, after working eight (8) hours jockeying trailers around the Oregon Ave - Philadelphia UPS yard, Plaintiff was told to drive a trailer (#827629) from the Philadelphia UPS yard to the UPS facility located in Hunt Valley, Maryland. On the return trip, Plaintiff was instructed to drive a trailer (#887978) to Philadelphia.

30. That evening, during the return trip, Plaintiff stopped at the "Chesapeake House" rest stop on I-95 to use the bathroom. After using the bathroom and splashing water on his face, Plaintiff exited and saw a co-worker, Sam Mendez.

31. Plaintiff decided to use his ten-minute break to re-charge and talk to Mendez. Sal Falice, another co-worker, also stopped to talk. During the conversation, Mendez provided tips on how to stay awake during the later hours of long trips.

32. After the ten-minute break, the drivers returned to their trucks. As Plaintiff started up his truck, Mendez ran over and asked for a quarter. Plaintiff tossed Mendez a quarter and drove off. Plaintiff, at no time, knew what Mendez needed the quarter for and assumed generally that he needed the quarter for monetary reasons.

33. In total, Plaintiff worked approximately thirteen and one-half (13 ½) hours on April 17, 2015. The "Chesapeake House" rest stop occurred during the last two (2) hours of his double-shift.

34. On or about April 22, 2015, while Plaintiff was working, Plaintiff was called into the office. John Fiorentino, a New Jersey chapter leader, accused Plaintiff of "stealing time" by not clocking out while Plaintiff stopped to use the bathroom on April 17, 2015.

35. No explanation was provided for why Fiorentino was involved, let alone leading, the accusations as he was not a member of the local Philadelphia union – Teamsters Local 623.

36. Fiorentino explained that they had a video of Plaintiff stopping at the "Chesapeake House" rest stop. Fiorentino further stated that Plaintiff failed to clock out for his bathroom break.

37. Fiorentino then questioned Plaintiff concerning the quarter – specifically as to whether Plaintiff gave Mendez a quarter. Plaintiff answered as best as he could remember, but explained that he had worked a thirteen and one-half (13 ½) hour day and could not remember much of the meaningless details. Plaintiff did truthfully tell the group that he had given Mendez a quarter as Plaintiff was leaving.

38. Fiorentino terminated him at the conclusion of the questioning on the incorrect basis that Plaintiff had "stolen time." Plaintiff was then humiliatingly escorted by guards to the gate in front of many co-workers.

39. Approximately two weeks later, Plaintiff received in the mail a letter terminating his employment. (Exhibit A – Termination Letter). The letter provided that Plaintiff was terminated before of Plaintiff's "guilty knowledge with regards to equipment tampering and your failure to follow methods and procedures."

40. However, in reality, Plaintiff was terminated in retaliation for his national campaign to vote down the national UPS contract and for his involvement with The Integrity Slate in clear violation of his Constitutional and statutory rights.

41. Further, Plaintiff did not have "guilty knowledge with regards to equipment tampering" as he had no knowledge of any equipment tampering.

42. Finally, Plaintiff in fact followed the methods and procedures concerning the rest stop.

43. Plaintiff filed two grievances. Plaintiff filed Grievance #9965 for unjust termination (Exhibit B – Grievance #9965) and Grievance #9966 for constant harassment (Exhibit C – Grievance #9966).

44. Grievance #9966 was never addressed. Despite the aforementioned, ongoing and constant harassment from the Teamsters Local 623 leadership and co-workers, Teamsters Local 623 never pursued Grievance #9966, ignoring their duties to Plaintiff, as well as Plaintiff's requests.

45. On or about May 1, 2015, a hearing was held with regards to Grievance #9965 for unjust termination. The Hearing Panel initially stated that Plaintiff was terminated because he had failed to clock-out for his bathroom break.

46. Defendant, John Doe 2, Teamsters Local 623 President, Bill Morris, who Plaintiff had previously ran against, represented Plaintiff before the Hearing Panel – Plaintiff was not given a choice of who would represent him.

47. Plaintiff explained to the Hearing Panel that (a) the UPS IVIS and Timecard systems do not have a procedure or ability to clock out for a bathroom break; (b) Plaintiff was recently trained by two (2) supervisors separately and neither clocked-out during the times they stopped for a bathroom break; and (c) requiring Plaintiff to clock out for bathroom breaks as a tractor trailer hauler was illegal.

48. After hearing Plaintiff's reasonable explanations and knowing the truth of the matter, the Hearing Panel then asked Plaintiff questions about the quarter, accusing Plaintiff of equipment tampering. Plaintiff learned for the first time that Mendez had used the quarter Plaintiff had given him to tamper with Falice's truck's air lines as a prank. Plaintiff emphatically and truthfully denied any knowledge or involvement with the prank, other than innocently providing Mendez with a quarter when requested.

49. The Hearing Panel watched a video several times but refused to allow Plaintiff to see it. The Hearing Panel claimed that the video provided proof of Plaintiff's tampering with the vehicle.

50. At the end of the hearing, Plaintiff was again escorted off the premises by guards.

51. The Hearing Panel upheld Plaintiff's termination because Union members, specifically Greg Yerace, voted for Plaintiff's termination; the decision never went to the impartial arbitrator.

52. At all material times, Plaintiff's representative, Morris was conspiring with Greg Yerace, a panel member who sat on behalf of the Union, to terminate Plaintiff.

53. The Hearing Panel Co-Chair, representing the Union was Greg Yerace. Yerace works hand-in-hand with Ken Hall, Hoffa's top lieutenant, at Teamsters Local 175. Upon information

and belief, Yerace was instructed to terminate Plaintiff regardless of the lack of evidence or just cause.

54. Plaintiff filed six more grievances. (Exhibit D – Additional Grievances). Through the grievances, Plaintiff requested to see the video and claimed that the termination was retaliatory.

55. As a result of the additional grievances, Plaintiff was shown the video. The video clearly shows Plaintiff take a ten-minute break, from 7:57pm to 8:07pm – the appropriate amount of time for a restroom break. It does not show any evidence of Plaintiff tampering with any equipment, nor coming anywhere near Falice's truck.

56. In or around Thursday, May 14, 2015, a letter was sent to Plaintiff advising him that a Committee would hear his grievance/appeal regarding his termination in Asheville, NC on May 19th and 20th. (Exhibit E – Hearing Notice). The letter required Plaintiff to notify the local union if he was going to attend at least five days before the hearing; i.e. the same day the letter was sent.

57. Plaintiff made arrangements and attended the hearing in North Carolina.

58. On or about May 19, 2015, Plaintiff attended the hearing. Plaintiff offered a letter from Bill Morris, a local union leader into evidence. (Exhibit F – Morris Letter). However, Morris was still conspiring with Yerace to ensure Plaintiff was terminated; the Letter was simply pre-textual cover.

59. Additionally, upon information and belief, Morris was also conspiring with Dennie Gandee, who sat on the final hearing on behalf of UPS, to terminate Plaintiff regardless of the evidence or just cause in retaliation for Plaintiff's national "Vote No" campaign and Plaintiff's involvement in The Integrity Slate.

60. Plaintiff also submitted a notarized statement from Mendez stating that Plaintiff "had nothing to do with the quarter incident." (Exhibit G – Mendez Statement). Mendez had been

previously terminated for the incident after admitting that he had committed the "tampering" without Plaintiff's knowledge

61. Finally, Plaintiff submitted a notarized statement, that Plaintiff made, stating that he had "never been trained by any part of management on how to properly code restroom stops." (Exhibit H – Curry Statement).

62. Despite the evidence that Plaintiff knew nothing of the quarter prank and was never trained to clock out during restroom breaks, Plaintiff's termination was upheld. (Exhibit I – Termination Decision Letter) ("Termination Decision Letter").

63. Although the Termination Decision Letter was dated May 20, 2015, Plaintiff did not obtain a copy of the letter for several months and after several attempts to obtain it.

64. The Termination Decision Letter was signed by Dennie Gandee, on behalf of UPS, and Greg Yerace, on behalf of the Union. Again, Yerace, who works closely with Hoffa, was instructed to terminate Plaintiff regardless of the evidence.

65. Additionally, Plaintiff filed a claim with the Pennsylvania Department of Labor & Industry. Plaintiff sought Unemployment Compensation. As a result of the claim, the Department found that there was "insufficient information provided to show that the Claimant committed a dishonest act" and award Plaintiff benefits under the Pennsylvania Unemployment Compensation Law. (Exhibit J – Unemployment Letter).

66. Plaintiff was terminated in retaliation for his national campaign to vote down the national UPS contract and for his involvement with The Integrity Slate in clear violation of his Constitutional and statutory rights.

67. Several other union members across the country, who ran on reform tickets for top leadership positions of local unions and/or were involved in the Vote No campaign, have also been

terminated for dubious reasons in retaliation. For example, cases 06-CA-143062 and 06-CA-146179, are both currently pending before the National Labor Relations Board.

68. As a result of the aforesaid, Plaintiff suffered significant financial harm and severe emotional distress including loss of employment and employment benefits.

### III. CAUSES OF ACTION

#### COUNT I
#### Wrongful Discharge

69. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

70. At all material times, the Collective Bargaining Agreement entered into between UPS and Teamsters Local 623 was for the intended and direct benefit of the stockholders of UPS and the union members of the Teamsters Local 623; i.e. Plaintiff.

71. At all times relevant, Plaintiff was employed by Defendants under the Collective Bargaining Agreement, which provided Plaintiff with employment for a specific term, i.e. the duration of the Collective Bargaining Agreement. Thus, Plaintiff was not an at-will employee.

72. Defendants were required to only terminate Plaintiff if Defendants had just and/or proper cause.

73. Defendants made false claims against Plaintiff, knowing that the claims were false.

74. Despite the claims being false and all credible and material facts there supporting, Defendants took adverse action against Plaintiff, namely firing Plaintiff, as a punitive measure and in retribution for the negative nation-wide publicity and the substantially great workload caused by the "Vote No" movement including stress and additional rounds of negotiations.

75. Defendants did not have just and/or proper cause to discharge Plaintiff.

76. Defendants retaliated against Plaintiff.

77. As described above, Defendants breached the Collective Bargaining Agreement when they fired Plaintiff without just and/or proper cause and in retaliation for the negative nation-wide publicity and the substantially great workload caused by the "Vote No" movement including stress and additional rounds of negotiations.

78. As a result of Defendants' actions, Plaintiff has sustained damages including loss of employment and employment benefits.

WHEREFORE, Plaintiff requests judgment in his favor and against Defendants, individually, jointly and/or severally, in an amount in excess of $50,000.00, including compensatory, statutory, and punitive damages, reasonable attorneys' fees, costs, and pre-judgment interest, and any further relief as this Court may deem proper, including injunctive relief.

**WEISBERG LAW**

*/s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esq.
L. Anthony DiJiacomo, III, Esq.
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Robert Curry | : | |
| 725 Rhoads Avenue | : | |
| Jenkintown, PA 19046 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| United Parcel Service, Inc. | : | NO.: 17-2331 |
| d/b/a UPS | : | |
| 55 Glenlake Parkway | : | |
| Atlanta, GA 30328 | : | |
| | : | |
| And | : | |
| | : | |
| Teamsters Local 623 | : | |
| 4369 Richmond Street | : | |
| Philadelphia, Pa 19137 | : | |
| | : | |
| Defendants. | : | |

## **CERTIFICATE OF SERVICE**

I, Matthew B. Weisberg, Esquire, hereby certify that on this 3rd day of July, 2017, a true and correct copy of the foregoing Plaintiff's First Amended Civil Action Complaint was served via ECF and regular mail, respectively, upon the following parties:

Gary M. Tocci, Esquire
Reed Smith, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103

Molly Q. Campbell, Esq.
Reed Smith, LLP
1301 K Street, N.W.
Suite 1000, East Tower
Washington, DC 20005

Lisa Leshinski, Esq.
Neal Goldstein, Esq.
Freedman and Lorry, P.C.
1601 Market Street, Second Floor
Philadelphia, PA 19103

                      **WEISBERG LAW**

                     */s/ Matthew B. Weisberg*
                    Matthew B. Weisberg, Esq.
                    L. Anthony DiJiacomo, III, Esq.
                    *Attorneys for Plaintiff*